## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **STEVEN L. SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 21-cv-12056-DJC** |
| ) | |
| **MARGARITA DAOU, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                    **March 4, 2024**

### I.    Introduction

Plaintiff Steven L. Smith ("Smith"), a former patient at the Worcester Recovery Center and

Hospital ("WRCH"), has filed this lawsuit against the movants, Defendants Margarita Daou, M.D.;

Sherry Hannon, LSCW; Lisneette "Donna" Santana, RN; Sara Maker, RN; Agatha Cretzu, RN;

and Carlton Kemp, MHW (collectively, "Defendants").[1]  D. 86.  Smith alleges Defendants failed

to protect him from an assault by another patient at WRCH on or about April 9, 2021, in violation

of 42 U.S.C. § 1983.[2]  D. 86 at 6; see D. 83.  Defendants Hannon, Santana, Maker and Kemp

---

[1] Defendants Adele Olewaseum and Jermaine Marshall have not been served, D. 100, 102, 130, 131.  The Commonwealth Defendants' motion indicates that both are former employees of the Commonwealth, but that counsel has been unable to reach them.  D. 112 at 1 n.1.  Although Olewaseum and Marshall are not parties to the Commonwealth's motion, much of the Court's legal analysis here likely would apply to them as well.  Although the Court invited Smith to file a motion with current addresses for same, D. 151 (entered on October 3, 2023), he has not done so.

[2] In addition to his "failure-to-protect" claim, Smith raised various other claims in the amended complaint, D. 86.  The Court, however, dismissed these other claims following a

(collectively, the "Commonwealth Defendants") have moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(6) and 12(b)(5). D. 112. Defendants Daou and Cretzu have separately moved to dismiss the amended complaint pursuant to Rule 12(b)(6) and 12(b)(5). D. 116. For the reasons stated below, the Court ALLOWS the Commonwealth Defendants' motion to dismiss as to Santana only but otherwise DENIES the motion. D. 112. As to the motion to dismiss brought by Defendants Daou and Cretzu, the Court DENIES the motion as to Daou and ALLOWS the motion as to Cretzu under Fed. R. Civ. P. 12(b)(5) and dismisses the action as to her without prejudice. D. 116.

## II.     Standards of Review

### A.     <u>Failure to State a Claim</u>

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. <u>García-Catalán v. United States</u>, 734 F.3d 100, 103 (1st Cir. 2013). "Exhibits attached to the complaint are properly considered part of the pleading for all purposes, including Rule 12(b)(6)." <u>Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.</u>, 524 F.3d 315, 321 (1st Cir. 2008) (internal quotation marks and citation omitted). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. <u>García-Catalán</u>, 734 F.3d at 103. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. <u>Id.</u> Second, the Court must determine whether

---

preliminary screening of the amended complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, D. 83, so only the failure-to-protect claim is before the Court in consideration of the pending motions to dismiss.

the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A *pro se* plaintiff is entitled to a liberal reading of his allegations, regardless of how inartfully pled. See Haines v. Kerner, 404 U.S. 519, 520–21 (1972); Rodi v. S. New Eng. Sch. of L., 389 F.3d 5, 13 (1st Cir. 2004). He, however, must still comply with procedural and substantive law and "dismissal remains appropriate . . . when the complaint fails to even suggest an actionable claim." Overton v. Torruella, 183 F. Supp. 2d 295, 303 (D. Mass. 2001) (citing Lefebvre v. Comm'r of Internal Revenue, 830 F.2d 417, 419 (1st Cir. 1987)).

### B. Insufficient Service of Process

It is well established "that a judgment rendered in the absence of personal jurisdiction is a nullity." Vázquez-Robles v. CommoLoCo, Inc., 757 F.3d 1, 4 (1st Cir. 2014). "The existence of such jurisdiction normally depends on legally sufficient service of process." Id. "[Al]though personal jurisdiction and service of process are distinguishable, they are inextricably intertwined, since service of process constitutes the vehicle by which the court obtains jurisdiction." United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1992). The Court may dismiss a complaint for insufficient service of process. Evans v. Staples, Inc., 375 F. Supp. 3d 117, 120 (D. Mass. 2019); see Fed. R. Civ. P. 12(b)(5).

### III.    Factual Background and Procedural History

Unless otherwise indicated, the following facts are drawn from the allegations in Smith's amended complaint and the attached exhibits, <u>see</u> D. 86; D. 86-1, and presumed to be true for the purposes of resolving the motion to dismiss.

On March 25, 2021, Smith was committed to WRCH for an evaluation of his competency to stand trial.  D. 86 ¶ 1; D. 86-1 at 6, 8, 47–48.  While at WRCH, Smith's treatment team consisted of Daou, Hannon, Cretzu and Maker ("Treatment Team").  D. 86 ¶¶ 10, 12.  Smith's room was at the far end of a locked hospital wing, staffed by Kemp and at least two other named defendants, Jermaine Marshall and Adele Olewaseun.  <u>Id.</u> ¶¶ 10, 13.  Another patient, "Kyle," was assigned to the room adjacent to Smith's; neither room had "locks on the doors."  <u>Id.</u> ¶ 10.  As alleged by Smith, Kyle was a "violent" person, with "a history of attacking people."  <u>Id.</u> ¶ 9.

Sometime after Smith's arrival at the WRCH, Kyle began "making threats" toward Smith and "calling [him] a child rapist."  <u>Id.</u> ¶ 10.  Smith alleges that staff had told Kyle his criminal charges, which included the alleged rape of a child.  <u>Id.</u>  Fearful of Kyle, Smith raised his concerns "at more than one [t]eam [m]eeting" to the Treatment Team.  <u>Id.</u>  Smith also called and left voicemails for Daou and Hannon to report the alleged threats, but "no action was taken" in response.  <u>Id.</u> ¶ 11.  Smith alleges that, given the circumstances, he was terrified and worried that Kyle would assault him in his sleep.  <u>Id.</u> ¶ 10.

On April 9, 2012, Smith met again with the Treatment Team.  <u>Id.</u> ¶ 12.  He "told all of them that Kyle's threats were becoming more and more brazen," to the point where Kyle was openly telling Smith and staff "that he was not playing, you know me, you better move this rapist."  <u>Id.</u> ¶ 12.  Smith then returned to his WRCH wing "where Kyle's ire grew" as Kemp and other staff members "all stood around trying to calm Kyle down."  <u>Id.</u> ¶ 13.  The staff told Smith, "[w]e can't

move him" because "there's no room" and added that they "don't make moves" because such decisions are "up to the doctors/nurses." Id. "[N]ot long after leaving the team meeting on [April 9, 2021]," Kyle allegedly assaulted Smith, id. ¶ 14, which the video referenced in the Complaints Department investigation, referenced below, apparently showed Kyle spitting at Smith.  D. 86-1 at 17.

On April 12, 2021, Smith submitted a complaint to the Complaints Department of WRCH alleging "that a peer is threatening" him and that he had "notified his social worker that he is in fear for his safety." D. 86-1 at 15.[3]  Following an investigation into the complaint, which entailed witness interviews and a review of video footage of the April 9 incident, the Complaints Department issued a summary of findings. Id. at 16.  According to the summary of findings, Smith alleged that Kyle "ha[d] been antagonizing him since he came to the unit" and that Kyle was "accusing him of being a sex offender and threatened to beat him up." Id.  Defendants Maker, Hannon and Kemp were among those interviewed. Id.  Maker told the Complaints Department that Smith and Kyle had "been antagonizing each other for days; staff have been monitoring and redirecting them" and that "when [Smith] complained about being threatened by [Kyle], [Smith] was offered several times to move out of the wing, but he refused it." Id.  As to the alleged assault, Maker said that "the alleged incident was not reported to her by staff." Id.  Staff members interviewed, including Kemp, said that "they did not witness the alleged assault" and that Maker "found out about it from her supervisor 48 hours later," at which time she "met with the staff on duty the day of the alleged incident to investigate." Id.

---

[3] These facts are drawn from a report issued by the Complaints Department, which the Court properly may consider because Smith attached a copy of the report to the amended complaint.  See Trans-Spec Truck Serv., Inc., 524 F.3d at 321.

The summary of findings provide additional details concerning the April 9 assault, based upon another witness's ("Witness 5") observation of the incident and video footage of same.  Id. at 16–17.  According to Witness 5, Smith "was standing in the lounge area next to the television when [Kyle] walk[ed] by the patient, spat on him, and also through [sic] an empty milk carton to the patient."  Id. at 17.  Witness 5 added that Kyle "did not punch the patient on the back of the head" and that "other staff witnessed the incident; they intervened and redirected both patients."  Id.  Video footage also showed Kyle "walking toward [Smith] moving his head backward and spitting at him."[4]  Id.

Based on these findings, the Complaints Department concluded that "the patient was assaulted by [Kyle] and that there was staff present at the time and place of the incident."  Id.  The Complaints Department further determined "that staff did contribute to an incident and/or condition that were dangerous, illegal, and/or inhumane, as defined by DMH Regulations 104 CMR 32.00" and thus deemed Smith's complaint "substantiated."  Id. at 18.

Smith now has filed this lawsuit against Defendants.  D. 1.  He later moved to amend the complaint, which this Court allowed after a preliminary screening of the amended complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A.  D. 83.  Specifically, the Court allowed Smith to pursue his claim that "certain staff at the Worcester Recovery Center and Hospital [ ] failed to protect Smith from assault by another patient at WRCH on or about April 9, 2021" and dismissed the remaining claims.  D. 83.  Defendants Santana, Hannon, Maker and Kemp (the "Commonwealth

---

[4] In Smith's opposition to the motions, he raises new factual allegations in connection with the alleged assault.  For instance, Smith asserts that, although his "assault didn't lead to hospitalization," he was "punched more than once by patient Kyle."  D. 128 ¶ 10.  "[A]ssertions in an opposition to a motion [to dismiss] are not the equivalent of factual allegations," and the Court will not consider them as if pled in the amended complaint.  Steele v. Turner Broadcasting Sys., Inc., 607 F. Supp. 2d 258, 263 (D. Mass. 2009).

Defendants") have moved to dismiss Smith's amended complaint under Fed. R. Civ. P. 12(b)(6) and 12(b)(5). D. 112. Defendants Daou and Cretzu have separately moved to dismiss the amended complaint on the same grounds. D. 116. Smith has opposed both motions. D. 127; D. 128; D. 143; D. 145.

## IV.  Discussion

Smith alleges that Defendants failed to protect him at WRCH, in violation of 42 U.S.C. § 1983, and seeks both damages and injunctive relief. D. 86 at 19–20. The Commonwealth Defendants argue that Smith has failed to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). They argue that because the Court allowed Smith to pursue only his allegations related to his "failure-to-protect" claim, see D. 83, Smith can no longer maintain an action as to Santana—whose involvement in the same is not alleged in the amended complaint. D. 113 at 6–8. The Commonwealth Defendants further contend that the amended complaint should be dismissed for failure to allege more than a *de minimis* injury and that, regardless, they are entitled to qualified immunity. Id. at 8–18. Defendants Daou and Cretzu seek dismissal under Rule 12(b)(6) on substantively similar grounds. D. 117 at 4-6. Defendants all move to dismiss the amended complaint for lack of sufficient service of process under Rule 12(b)(5). D. 113 at 18-20; D. 117 at 3-4.

### A.   Official Capacity Claims

Smith has filed the amended complaint against Defendants in their official capacities, in addition to their individual capacities. D. 86 at 1. Thus, before proceeding to the substance of Defendants' motions, the Court considers whether Smith may sue Defendants in their official capacities.

As already noted, Smith seeks both damages and injunctive relief as to Defendants.  D. 86 at 19–20.  However, "[i]t is settled beyond peradventure . . . that neither a state agency nor a state official acting in his official capacity may be sued for damages in a section 1983 action." Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991).  While injunctive relief may be sought against defendants in their official capacities, a plaintiff must have standing to do so.  See City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) (holding that a plaintiff does not have standing to seek injunctive relief "[a]bsent a sufficient likelihood that [a plaintiff] will again be wronged in a similar way").  More specifically, Smith must "'establish a real and immediate threat' resulting in 'a sufficient likelihood that he will again be wronged in a similar way.'"  Gray v. Cummings, 917 F.3d 1, 19 (1st Cir. 2019) (quoting Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992)).

Smith alleges that he is a "pre-trial detainee at Barnstable County Jail," D. 86 at 1, i.e., no longer a patient at WRCH.  Accordingly, he does not face a "real and immediate threat" that, absent the injunctive relief sought, he will likely be wronged in a manner similar to the alleged misconduct at WRCH.  See Gray, 917 F.3d at 19; see also Wilson v. Yaklich, 148 F.3d 596, 601 (6th Cir. 1998) (concluding that a claim for injunctive relief is unavailing where inmate was no longer incarcerated at the institution where allegedly unconstitutional prison conditions existed). The Court, therefore, concludes that Smith may only pursue his claim against Defendants in their individual capacities.  See Powell v. Alexander, 391 F.3d 1, 23–24 (1st Cir. 2004) (explaining that a § 1983 plaintiff may seek damages against state officials in their individual capacities).

**B.      Failure to State a Claim Under Rule 12(b)(6)**

As to the remaining claims against Defendants in their individual capacities, the Court turns to Rule 12(b)(6) grounds to dismiss.  See D. 113 at 5–16; D. 117 at 4–6.

### 1.    *Defendant Santana*

The Commonwealth Defendants argue that, in light of this Court's order, D. 83, allowing Smith to pursue only his allegations that "certain staff at the Worcester Recovery Center and Hospital [ ] failed to protect Smith from assault by another patient at WRCH on or about April 9, 2021," the amended complaint must be dismissed as to Defendant Santana.  See D. 113 at 6–8. Having reviewed the amended complaint, the Court agrees.  A complaint "must contain sufficient factual matter."  Ashcroft, 556 U.S. at 678.  Failure to include factual allegations in a complaint deprives a defendant of "fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007) (quoting Fed. R. Civ. P. 8(a)).  As the Commonwealth Defendants contend, D. 113 at 7-8, none of the allegations directed at Santana bear any relation to Smith's failure-to-protect claim—the only claim which Smith may pursue, D. 83.  Accordingly, the Court will allow the Commonwealth Defendants' motion to dismiss as to Santana.

### 2.    *Defendants Hannon, Maker, Kemp, Cretzu, Daou*

As to the other Defendants, the Court must assess whether Smith plausibly has alleged a violation of 42 U.S.C. § 1983.  There are two elements to a § 1983 claim:  (1) that the conduct complained of transpired under the color of state law; and (2) as a result, the plaintiff suffered a deprivation of his rights.  See Klunder v. Brown Univ., 778 F.3d 24, 30 (1st Cir. 2015) (citing Santiago v. Puerto Rico, 655 F.3d 61, 68 (1st Cir. 2011)).  Whether Defendants acted under the color of state law while working at WRCH, a state hospital, does not appear to be in dispute.

As to whether Smith plausibly has alleged a deprivation of rights in connection with Defendants' alleged failure-to-protect him, the Court's "first step is to identify the exact contours" of Smith's constitutional right to protection.  See County of Sacramento v. Lewis, 523 U.S. 833,

841 n.5 (1998).  "[F]ailure to protect claims are scrutinized under different standards in different institutional settings."  Alves v. Murphy, 530 F. Supp. 2d 381, 387 (D. Mass. 2008).  For those subject to involuntary commitment, the failure to protect a patient creates liability under the Due Process Clause of the Fourteenth Amendment in situations where a "decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  Youngberg v. Romeo, 457 U.S. 307, 323 (1982).  For pretrial detainees, a failure-to-protect claim arises where officials in custody of the detainee demonstrate a "deliberate indifference to a substantial risk of serious harm."  Farmer v. Brennan, 511 U.S. 825, 836 (1994).  This claim, too, is rooted in the Due Process Clause of the Fourteenth Amendment but generally analyzed by reference to Eighth Amendment jurisprudence.  See Bell v. Wolfish, 441 U.S. 520, 545 (1979) (acknowledging that Due Process protections for pretrial detainees are "at least" as great as those "enjoyed by convicted prisoners"); Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002) (noting that "[p]retrial detainees are protected under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment; however, the standard to be applied is the same as that used in Eighth Amendment cases").  Because Smith was involuntarily committed to WRCH and also a pretrial detainee, the Court will consider both whether Smith has alleged a plausible failure-to-protect claim under either Youngberg's "professional judgment" standard or Farmer's "deliberate indifference" standard.

a)      Youngberg "Professional Judgment" Standard

Assuming the truth of the allegations in the complaint, and drawing all reasonable inferences in Smith's favor, Smith has plausibly alleged a failure-to-protect claim under Youngberg.  Smith alleges that from his arrival at WRCH on March 25, 2021 to the date of the

alleged assault, April 9, 2021, he routinely received threats from Kyle, a fellow patient.  D. 86 ¶ 10; D. 86-1 at 16.  While Smith does not allege the content of each threat in detail, he has attached to the amended complaint a copy of the WRCH Complaints Department's findings, which reflects allegations that Kyle threatened Smith with physical violence.  See D. 86-1 at 16 (noting Smith's assertion that Kyle "threatened to beat him up").  Smith also alleges that Kyle had a history of attacking others, that Kyle knew of the serious charges against Smith and would routinely call him a "child rapist" and that Smith's room was right next to Kyle's, in rooms that could not be locked, at the far end of a locked wing of WRCH.  D. 86 ¶ 9–10, 13.  Smith's allegations therefore indicate the plausibility that, from March 25 to April 9, he reasonably feared for his physical safety.

Whether these circumstances mark a substantial departure from professional judgment necessarily depends on what Defendants knew and what steps, if any, they took to address the situation.  To that end, Smith alleges that Defendants knew of the foregoing threats and circumstances.  For instance, he alleges that he told the Treatment Team on more than one occasion about Kyle's threats, that he left voicemails for Daou and Hannon about same, that Kemp and others were present when Kyle had to be calmed down after such threats, and that Kyle openly told him and staff that "he was not playing, you know me, you better move this rapist."  D. 86 ¶¶ 10–13.  Smith has alleged not only threats of physical violence and circumstances heightening their credibility and urgency, but also that Defendants knew same, the allegations in the amended complaint give a plausible basis to question whether Defendants' decision departed from accepted professional judgement, practice and standards.  See Cameron v. Tomes, 990 F.2d 14, 20 (1st Cir. 1993).

Cutting the other way is the relatively short time period covered by Smith's failure-to-protect allegations, i.e., roughly two weeks, starting with his commitment to WRCH on March 25,

2021 and ending with the incident on April 9, 2021.  See Alves, 530 F. Supp. 2d at 387 (explaining that the "length of time" someone "is exposed to an adverse condition is relevant in assessing whether a constitutional violation has occurred").  Moreover, the allegations surrounding the incident itself—which involved spitting and the throwing of an empty milk carton—while undoubtedly annoying, may not evince a substantial departure of professional judgment by staff, who, even as alleged, tried to calm Kyle down on April 9 before the incident, D. 86 ¶ 13; see Alves, 530 F. Supp. 2d at 387 (noting that "any analysis of a substantive due process claim in this context must take into account that 'an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement'") (quoting Youngberg, 457 U.S. at 320).

Further supporting the plausibility of Smith's claims, however, are the findings and conclusions of the WRCH Complaints Department, which more than any of Smith's allegations provide some objective criteria into "accepted professional judgment, practice, or standards." D. 86-1 at 16–18.  Following interviews with Smith, Defendants Maker, Hannon and Kemp, among others, as well as a review of video footage, the WRCH Complaints Department concluded that "the staff did contribute to an incident and/or condition that were dangerous, illegal, and/or inhumane" and determined that Smith's fears for his safety were "substantiated."  Id. at 18.

As the Supreme Court explained in Youngberg, 457 U.S. at 323, "[i]n an action for damages against a professional in his individual capacity . . . the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints." However, at this stage, where the Court must assume Smith's allegations to be true, and draw all

reasonable inferences in his favor, Smith has plausibly alleged a failure-to-protect claim under Youngberg.[5]

a)      Farmer "Deliberate Indifference" Standard

Next, the Court considers whether Smith has sufficiently alleged a failure-to-protect claim under the "deliberate indifference" standard set forth in Farmer.  The "deliberate indifference" standard has two prongs—one objective, the other subjective.  As to the objective prong, the alleged injury must, in objective terms, be "sufficiently serious."  Farmer, 511 U.S. at 834 (noting that "[i]t is not [ ] every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety").  As to the subjective prong, a plaintiff must show the officials are "deliberately indifferent," meaning that they "know[ ] of and disregard[ ] an excessive risk to inmate safety."  Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018) (quoting Farmer, 511 U.S. at 837).  Specifically, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  The First Circuit has also noted that officials "cannot be deliberately indifferent if they responded reasonably to the risk."  Burrell, 307 F.3d at 8.

The Commonwealth Defendants argue that Smith has failed to satisfy prong one of the Farmer standard, reasoning that the alleged assault and threats were not "objectively, sufficiently serious" and emphasizing that no actual physical injury was suffered.  D. 113 at 11 (quoting Calderon-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002)).  As to the April 9, 2021

---

[5] The Commonwealth Defendants cite Alves, 530 F. Supp. 2d at 386–89 in support of their argument that the Youngberg standard does not reach the alleged, but *de minimis* injury here. There, Alves had been "double-bunked" with an individual previously convicted of rape.  Id. at 385, 388.  Once Alves alerted defendants that his roommate had lifted his bed sheets to look at him, "the defendants immediately transferred Alves to another housing unit."  Id.  By contrast, here, Smith alleges that Defendants did not move him or take any other, sufficiently protective action despite knowing of alleged threats of physical violence.

incident, where Kyle allegedly spat on Smith and threw an empty milk carton at him, D. 86-1 at

17, the Court agrees that, without more, it is likely that such allegations would not be sufficiently

serious.  See Jones v. Salley, No. 2:12-cv-510-FtM-29DNF, 2013 WL 5567321, at *3 (M.D. Fla.

Oct. 9, 2013) (explaining that, "[t]o the extent the[ ] correctional officers did not protect Plaintiff

from other inmates spitting on him, this allegation, without more, cannot reasonably be perceived

as presenting a substantial risk of serious harm"); Kocher v. Luzerne Cnty. Corr. Facility, No.

1:11-CV-1000, 2011 WL 2470382, at *3 (M.D. Pa. June 20, 2011) (concluding that an inmate's

"allegation that he was spit on, without more, cannot reasonably be perceived as presenting a

substantial risk of serious harm").

Here, however, Smith has alleged more.  As previously discussed in this Court's

Youngberg analysis, Smith has alleged that over a roughly two-week period Kyle repeatedly

threatened him with physical violence and would call him a "child rapist."  D. 86 ¶ 10.  He also

alleged circumstances heightening the urgency of the situation and the credibility of the threats,

namely that Kyle was a "violent" person with a "history of attacking people," that his room was

next to Smith's room at the far end of a locked hospital wing and that neither room had locks.  Id.

¶¶ 9, 10, 13.  These alleged circumstances led Smith to develop a reasonable fear that Kyle would

assault him in his sleep.  Id. ¶ 10.  The WRCH Complaints Department investigated Smith's safety

concerns and concluded that they were substantiated based on discussions with numerous

witnesses and a review of video footage of the April 9 incident.  D. 86-1 at 16–18.

The Commonwealth Defendants question the seriousness of the alleged threats,

characterizing the amended complaint's references to threats and name-calling as "vague" or

"conclusory." D. 113 at 12. The Commonwealth Defendants are correct that, with one exception,[6] the amended complaint is scant on details concerning the precise language of the alleged threats. Although more detailed allegations as to the content of the threats would have rendered Smith's failure-to-protect claim more plausible, Smith is a *pro se* plaintiff and therefore "entitled to a liberal reading of his [ ] allegations, regardless of how inartfully pled," see Haines, 404 U.S. at 520–21, and on a Rule 12(b)(6) motion the Court cannot construe a threat to "beat [Smith] up," D. 86-1 at 16, as anything less than a threat of physical violence.

The Commonwealth Defendants further suggest that threats of physical violence which do not lead to actual, physical injury cannot give rise to a failure-to-protect claim. See D. 113 at 13 (arguing the amended complaint should be dismissed because it does not "specifically allege that Smith suffered any actual, physical injury as a result of the assault"). Courts have taken different positions on whether actual, physical injury is required under Farmer. Some courts have held that threats of violence, without a resultant physical injury, cannot give rise to an Eighth Amendment claim. See, e.g., Bass v. Blount, No. 1:18CV75-RHW, 2019 WL 4197599, at *1 (S.D. Miss. Sept. 4, 2019) (stating that "the mere threat of violence does not by itself constitute a failure to protect"); Robinson v. Wall, No. 09-277 S, 2015 WL 728508, at *6 (D.R.I. Feb. 19, 2015) (concluding that "[t]hreats of violence, while deserving of censure if true, do not rise to the level of a constitutional violation"); Ferguson v. Pagati, No. 12-00653-VBF-DTB, 2013 WL 3989426, at *4 n.4 (C.D. Cal. Aug. 1, 2013) (acknowledging "an apparent split among Circuits as to whether threats made by prison officials against inmates can be the basis of an Eighth Amendment claim" but concluding that threats of violence are not enough in the Ninth Circuit); but see Heisler v. Kralik, 981 F. Supp.

---

[6] The amended complaint recounts an instance where Kyle specifically said he "was not playing, you know me, you better move this rapist." D. 86 ¶ 12. The Court draws the reasonable inference in Smith's favor that this remark was a veiled threat.

830, 837 (S.D.N.Y. 1997) (explaining that "prison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner. The failure to do so violates that prisoner's rights, whether or not an attack actually occurs, and if it does occur, whether or not the injuries suffered in an attack are serious"). The weight of federal authority, however, appears to indicate that, although verbal harassment (without more) is generally not sufficient, psychological harm stemming from credible threats of violence may, in an extreme case, be serious enough to violate the Eighth Amendment. See Hudspeth v. Figgins, 584 F.2d 1345, 1348 (4th Cir. 1978) (per curiam) (holding that a *pro se* prisoner's allegations that prison officials threatened him with physical harm may support an Eighth Amendment claim); Doe v. Welborn, 110 F.3d 520, 524 (7th Cir. 1997) (noting that the plaintiff could not show an Eighth Amendment violation because he showed "neither physical harm nor the kind of extreme and officially sanctioned psychological harm that might support a claim for damages under the Eighth Amendment"); Irving v. Dormire, 519 F.3d 441, 449 (8th Cir. 2008) (concluding that, "when viewed in light of their retaliatory nature, their objectively credible basis, and their fear-inducing result, the death threats allegedly made . . . form the basis of an injury sufficiently serious to implicate the Eighth Amendment"); Chandler v. D.C. Dep't of Corr., 145 F.3d 1355, 1360–61 (D.C. Cir. 1998) (noting that although generally inadequate, "verbal threats, without more, may be sufficient to state a cause of action under the Eighth Amendment," e.g., where they involve "the repeated threat of physical harm").

The First Circuit has taken a similar approach in its analysis of deliberate indifference claims. For instance, in Purvis v. Ponte, 929 F.2d 822, 825 (1st Cir. 1991), the First Circuit held that a prisoner had failed to allege an Eighth Amendment violation where "any perceived threat to Purvis's safety was short-lived" and noted that, although a roommate had expressed hostility

toward his sexual orientation, there were no allegations that "this inmate threatened him."  In reaching this conclusion, however, the First Circuit acknowledged the possibility of "fear of constitutional dimensions" and that same required a showing of "more than simple anxiety."  Id. (quoting Shrader v. White, 761 F.2d 975, 979 (4th Cir. 1985)).  Moreover, when discussing the Farmer standard, the First Circuit has, consistent with the Supreme Court's language, indicated that prison officials have a duty to protect inmates from the "risk" of violence.  See Burrell, 307 F.3d at 7 (emphasizing that officials have a responsibility not to be deliberately indifferent to the "risk to prisoners of violence" at the hands of other prisoners).

Given that threats of physical violence may induce "fear of constitutional dimensions" and that Smith is, at this stage, entitled to both a liberal reading of the amended complaint and the resolution of all reasonable inferences in his favor, he has plausibly alleged a sufficiently serious harm under Farmer.  Unlike in Purvis, 929 F.2d at 825, where the perceived threat was "short-lived" and where the prisoner's exposure to that threat "lasted less than twenty-four hours," here, Smith alleged that, over the span of roughly two weeks, Kyle would threaten him with physical violence.  D. 86 ¶¶ 1, 10, 12.  Smith also alleged circumstances highlighting the credibility of Kyle's threats and the gravity of Smith's fear that he would be assaulted in his sleep.  D. 86 ¶¶ 9, 10, 13.  It is, therefore, at least plausible that Smith may have endured "fear of constitutional dimensions" such that dismissal at this stage would be premature.  See Purvis, 929 F.2d at 825.

Although the Commonwealth Defendants do not focus on the subjective prong of Farmer, Defendants Cretzu and Daou argue that Smith's allegations do not support a reasonable inference that either of them attended the alleged meeting on April 9, 2021 or were otherwise aware of the alleged threats.  See D. 117 at 6.  Smith, however, alleges that the Treatment Team included both Cretzu and Daou.  See D. 86 ¶¶ 10, 12.  Smith further alleges that he raised his concerns regarding

Kyle "at more than one [t]eam [m]eeting," id. ¶ 10, and that he left voicemails for Daou as to same. Id. ¶ 11.  He also expressly alleges that he was seen by Cretzu and Daou on April 9, 2021.  Id. ¶ 12.  Assuming the truth of these allegations as the Court must at this juncture, he has sufficiently alleged that Defendants knew of Kyle's threats and the substantial risk to Smith's safety.  See Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018).  Having plausibly alleged a failure-to-protect claim under the Farmer standard, as well as the Youngberg standard, the Court proceeds to consider the Commonwealth Defendants' assertion of qualified immunity.

### C.  **Qualified Immunity**

The Commonwealth Defendants argue that, assuming Smith plausibly has alleged failure-to-protect claims, they are entitled to qualified immunity.  The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Because "qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere to defense to liability," it is to be "resolved at the earliest possible stage in litigation."  Maldonado v. Fontanes, 568 F.3d 262, 268 (1st Cir. 2009); see Eves v. LePage, 927 F.3d 575, 583 n.5 (1st Cir. 2019).  The First Circuit has recognized, however, that "[i]t is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity," and, thus, "courts often evaluate qualified immunity defenses at the summary judgment stage."  Giragosian v. Bettencourt, 614 F.3d 25, 29 (1st Cir. 2010).

The Supreme Court has articulated a two-part test to determine whether qualified immunity applies:  (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the

defendant's alleged misconduct.  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  Because Smith plausibly has alleged failure-to-protect claims under Youngberg and Farmer, the Court turns to the second prong, considering whether the right at issue was "clearly established" at the time of the alleged misconduct.

As to the "clearly established" prong, the First Circuit has identified two essential considerations.  "One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  "The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." Id.  At bottom, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  Id. (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

The law underlying Smith's failure-to-protect claim was clear at the time of the alleged misconduct.  For instance, in Youngberg, 457 U.S. at 314, decided in 1982, the Supreme Court recognized "for the first time the substantive rights of involuntarily committed [developmentally disabled] persons under the Fourteenth Amendment to the Constitution."  As previously discussed, under Youngberg, substantive due process is violated where the "decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 315–16.  The First Circuit has recognized that the application of Youngberg is premised on the institutional setting, rather than the identity of the person.  See Cameron, 990 F.2d at 20; see also Davis v. Rennie, 264 F.3d 86, 98 (1st Cir. 2001) (recognizing that a failure-to-protect claim may arise in the involuntary commitment setting due to the circumstances of confinement).

Even assuming *arguendo* that the law under <u>Youngberg</u> was not clear at the time of the alleged misconduct, the law surrounding failure-to-protect claims under <u>Farmer</u> is well established. <u>See</u> <u>Burrell</u>, 307 F.3d at 7–8.  Although some federal courts have suggested that threats of violence may never be enough to sustain an Eighth Amendment claim, as discussed above, there is ample guidance from other federal circuit courts, including the First Circuit, acknowledging the possibility of extreme cases where threats of violence resulting in psychological harm may be actionable.  <u>See</u> <u>Purvis</u>, 929 F.2d at 825; <u>see also</u> <u>Hudspeth</u>, 584 F.2d at 1348; <u>Doe</u>, 110 F.3d at 524; <u>Irving</u>, 519 F.3d at 449–50; <u>Chandler</u>, 145 F.3d at 1360–61.

Turning to the facts of this particular case, the Court is unable to determine at this stage "whether a reasonable defendant would have understood that his conduct violated [Smith's] constitutional rights" under <u>Youngberg</u> and <u>Farmer</u>.  The application of either constitutional standard in this case would require the Court to resolve factual questions best left for the summary judgment stage.  <u>See</u> <u>Irish v. Maine</u>, 849 F.3d 521, 523 (1st Cir. 2017) (emphasizing that, although issues of substantive due process and qualified immunity can be decided at the motion to dismiss stage, "they are often decided after some factual development or at summary judgment"); <u>Harnois v. Univ. of Mass. at Dartmouth</u>, No. 19-10705-RGS, 2019 WL 5551743, at *8 n.7 (D. Mass. Oct. 28, 2019) (noting that "[w]ithout a more comprehensive and balanced fleshing out of the facts, any decision on the issue of qualified immunity would be premature").  For example, it remains to be seen whether Kyle's threats against Smith were severe enough to indicate that Defendants' conduct amounted to a substantial departure of professional standards under <u>Youngberg</u> (the contours of which are also unclear on this record, <u>see</u> <u>Youngberg</u>, 457 U.S. at 323 (explaining that "[i]n an action for damages against a professional in his individual capacity . . . the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary

constraints; in such a situation, good-faith immunity would bar liability") or that they were "objectively, sufficiently serious" under <u>Farmer</u>.  In light of this undeveloped record, and accepting the truth of Smith's allegations, the Court cannot determine whether the Commonwealth Defendants are entitled to qualified immunity and, thus, declines to dismiss the amended complaint on such grounds.  <u>See</u> <u>Maldonado</u>, 568 F.3d at 271 (affirming denial of qualified immunity at the motion to dismiss stage and declining to credit defendant's "version of what happened" which was "inconsistent with the factual allegations of the complaint").[7]

### D.  <u>Insufficient Service Under Rule 12(b)(5)</u>

The Court proceeds to consider Defendants' arguments for dismissal pursuant to Fed. R. Civ. P. 12(b)(5).  The rules governing service of process as to Defendants Hannon, Maker, Kemp and Daou, who appear to reside within the United States, are set forth in Rule 4(e).  <u>See</u> D. 96; D. 98; D. 99; D. 101.  Rule 4(e) permits a plaintiff to effect service on an individual within a judicial district of the United States by:  (1) "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made," here, Massachusetts, Fed. R. Civ. P. 4(e)(1); (2) "delivering a copy of the summons and of the complaint to the individual personally," Fed. R. Civ. P. 4(e)(2)(A); (3) "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there," Fed. R. Civ. P. 4(e)(2)(B); or (4) "delivering a copy of each to an agent authorized by appointment or by law to receive service of process," Fed. R.

---

[7] The Court's ruling at this nascent point in the litigation "on qualified immunity based on the allegations in the complaint do not preclude the defendants from raising this defense at a later stage of this litigation, on a more developed factual record."  <u>Sanchez v. Pereira-Castillo</u>, 590 F.3d 31, 52 n.15 (1st Cir. 2009).

Civ. P. 4(e)(2)(C).  If a plaintiff is proceeding *in forma pauperis* under 28 U.S.C. § 1915, the court must order the United States Marshals Service to serve the defendants.  See Fed. R. Civ. P. 4(c)(3).

Defendant Cretzu is situated differently, as she apparently resides in Germany.  See D. 148. Rule 4(f) permits service to such defendants by various means which were not attempted here: (1) "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents," Fed. R. Civ. P. 4(f)(1); (2) "if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice," Fed. R. Civ. P. 4(f)(2); or (3) "by other means not prohibited by international agreement, as the court orders," Fed. R. Civ. P. 4(f)(3).

Under Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  Where, however, a plaintiff has shown "good cause" for the failure to effectuate service, "the court must extend the time for service for an appropriate period."  Id.  In determining whether a prisoner proceeding *in forma pauperis* has shown "good cause" arising from improper service through the United States Marshals Service ("USMS"), the First Circuit has cautioned district courts against placing the onus on the prisoner to provide the defendants' home addresses, particularly where the plaintiff has provided full names and a business address.  See Baez v. Connelly, 478 F. App'x 674, 676 (1st Cir. 2012) (unpublished); see also Laurence v. Wall, 551 F.3d 92, 94 (1st Cir. 2008).  "A prisoner may not have access to an arresting officer's residential address; serious security concerns might arise if a prisoner were able to obtain that information."  Baez, 478 F. App'x at 676.  Other courts in similar cases have explained that if the USMS can obtain the defendants' addresses

through "reasonable effort," but did not do so, the failure to effectuate service constitutes "good cause" under Rule 4(m).  See Richardson v. Johnson, 598 F.3d 734, 739–40 (11th Cir. 2010); Graham v. Satkoski, 51 F.3d 710, 713 (7th Cir. 1995); see also However v. Hampton, No. 4:14cv273-WS/CAS, 2015 WL 13849984, at *3 (N.D. Fl. Aug. 7, 2015) (ordering counsel for state department of corrections to provide, in confidence, any addresses for defendants on record to the USMS); Jones v. Dovery, 06-1979 LAB (AJB), 2008 WL 276584, at *2 (S.D. Cal. Jan. 30, 2008) (redirecting USMS to effect service of the summons and the amended complaint upon defendant whose actual address had been made known to the USMS in a confidential memorandum by the Deputy Attorney General).

Here, the Court granted Smith's motion for leave to proceed *in forma pauperis* and noted that "he may elect to have the United States Marshals Service complete service with all costs of service to be advanced by the United States."  D. 52.  Summons issued as to the amended complaint, D. 86, on February 21, 2023, and Smith was given 60 days to effectuate service.  D. 83. Smith elected to have the USMS to deliver copies of the summons and amended complaint; Smith completed Form USM-285, listing the WRCH address as the  address for serving Defendants Daou, Hannon, Maker and Kemp, and signed the process receipts on March 2 and 3, 2023 for delivery to Defendants.  D. 96; D. 98; D. 99; D. 101.  The USMS delivered the summons and complaint to the WRCH address, and service was received as to Daou, Maker and Kemp by Sergeant Anthony Langile of the Massachusetts Department of Mental Health.  D. 96; D. 98; D. 99.  The USMS was unable to deliver the summons and complaint to Hannon because she "does not work at this location."  D. 101.

Service was not properly effectuated as to Defendants Daou, Hannon, Maker and Kemp. See Zaragoza v. Ocean Spray Cranberries, Inc., No. CV 19-10650-JGD, 2020 WL 13824756, at

*4 (D. Mass. Mar. 11, 2020) (noting that "neither the federal rules nor the Massachusetts rules permit service upon an individual by certified mail at [their] place of employment") (quoting Mukherjee v. Blake, No. 12-11381-FDS, 2013 WL 2299521, at *2 (D. Mass. May 24, 2013)). Moreover, Sergeant Anthony Langile was not authorized to accept service on behalf of Daou, Maker and Kemp.  See D. D. 113-1 ¶ 4; 113-3 ¶ 3; D. 117-1 ¶ 5.  Because Smith is a prisoner proceeding in forma pauperis, however, "good cause" for the failure to effectuate service is shown if the USMS "likely would have been able to accomplish service of process pursuant to Rule 4(e)(2)(A)" given the information supplied by Smith.  See Baez, 478 F. App'x at 676.  Here, Smith provided the USMS with the full names and either the current (or former) place of work as to Defendants Daou, Hannon, Maker and Kemp, and there is no indication from the record whether, based on these steps, additional steps were taken to identify the appropriate addresses.  See id. Without a showing of "reasonable efforts" to identify addresses where Daou, Hannon, Maker and Kemp may properly be served, "good cause" exists for extending the time for Smith to serve Defendants Daou, Hannon, Maker and Kemp.  See Richardson, 598 F.3d at 740; Graham, 51 F.3d at 713; see also Hudson v. MacEachern, 94 F. Supp. 3d 59, 72 (D. Mass. 2015) (directing the Clerk to reissue summons for defendants and ordering defense counsel to provide "last known residential address" for defendants to the USMS because "Plaintiff is not in a position to know a present address at which to serve these Defendants").

With respect Defendant Cretzu, however, the USMS has indicated that it is unable to serve her because she is not in the United States.  See D. 148.  Because there have been no efforts by Smith to serve Cretzu under Rule 4(f), the Court concludes that there is no good cause to extend the deadline for service of same.  Thus, dismissal without prejudice is appropriate as to Cretzu.

## V.        Conclusion

For the foregoing reasons, the Court ALLOWS the Commonwealth Defendants' motion to dismiss as to Santana only but otherwise DENIES the motion.  D. 112.  As to the motion to dismiss brought by Defendants Daou and Cretzu, the Court DENIES the motion as to Daou and ALLOWS the motion as to Cretzu.  D. 116.  Pursuant to Fed. R. Civ. P. 4(m), the Court dismisses the action against Cretzu without prejudice.

As to all remaining Defendants (Hannon, Maker, Kemp and Daou), the Court ORDERS the following:  the Clerk shall reissue summons for Defendants Hannon, Maker, Kemp and Daou; defense counsel shall have until March 25, 2024 to provide, in confidence, the last known residential addresses of these Defendants to the USMS, to the extent counsel can ascertain this information (defense counsel shall file a one-page notice to the Court when they have done so and this notice need not contain the addresses that they provided to the USMS confidentially); once provided with this response, the USMS shall use reasonable efforts to determine if Hannon, Maker, Kemp and Daou can be located and then effectuate service under Fed. R. Civ. P. 4(e), with all costs of service advanced by the United States; the USMS shall protect the confidentiality of any address provided by defense counsel and shall not disclose any information provided or obtained concerning Defendants on any document filed with the Court; and USMS shall file a response to this Order on or before April 30, 2024, advising of its efforts to serve these Defendants or, in the alternative, shall file an executed summons.

Alternatively to the above, "if these Defendants wish to retain present defense counsel to represent them in this action, counsel may make a filing with this Court within thirty days agreeing to accept service on [their] behalf."  See Hudson, 94 F. Supp. 3d at 72.

**So Ordered.**

25

_/s Denise J. Casper_
United States District Judge