UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| | ) |
| | ) |
| STEVEN L. SMITH, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) Case No. 21-cv-12056-DJC |
| | ) |
| MARGARITA DAOU, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

MEMORANDUM AND ORDER

**CASPER, C.J.**                                                                       **July 16, 2026**

## I.    Introduction

Plaintiff Steven L. Smith ("Smith"), a former patient at the Worcester Recovery Center and Hospital ("WRCH"), filed this lawsuit *pro se* against various individuals including the sole remaining defendant, Dr. Margarita Daou ("Daou"). D. 1; D. 86. Smith alleges that Daou failed to protect him from an assault by another patient at WRCH on or about April 9, 2021, in violation of 42 U.S.C. § 1983. See D. 86 ¶ 14. Daou and Smith have now submitted cross-motions for summary judgment. D. 236; D. 240. For the reasons stated below, the Court ALLOWS Daou's motion for summary judgment, D. 236, and DENIES Smith's motion for summary judgment, D. 240.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence would enable a reasonable

1

factfinder to decide the issue in favor of either party." Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). "A fact is 'material' if it 'has the capacity to change the outcome of the [factfinder's] determination." Id. (alteration in original) (quoting Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014)). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmovant may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but instead, on any issue for which the nonmovant would bear the burden at trial, he "must point to definite and competent evidence showing the existence of a genuine issue of material fact," i.e., "evidence that is sufficiently probative of an issue [such] that a factfinder could resolve that issue in favor of the nonmoving party based on that evidence," Perez, 769 F.3d at 29-30. "Put another way, summary judgment is warranted if a nonmovant who bears the burden on a dispositive issue fails to identify 'significantly probative' evidence favoring his position." Irobe, 890 F.3d at 377 (quoting Anderson, 477 U.S. at 249). The Court reviews the summary judgment record in the light most favorable to the nonmovant, drawing all reasonable inferences in his favor, Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001), but only "to the extent supportable by the record," Scott v. Harris, 550 U.S. 372, 380, 381 n.8 (2007) (emphasis omitted). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

## III.    Factual Background

The Court draws the following facts primarily from Daou's statement of material facts, D. 237, and related exhibits, see D. 238. Although Smith submitted a statement of material facts, D. 244, it does not include "page references to affidavits, depositions and other documentation" as

required by this Court's Local Rules, see L.R. 56.1, but is instead set out in narrative form. The Court describes certain disputes raised by Smith regarding the content of documents in the summary judgment record to the extent relevant to issues before the Court.[1]

On March 25, 2021, a judge of the Barnstable Superior Court ordered Smith hospitalized for evaluation of his competency to stand trial. D. 237 ¶ 1; D. 238-1 at 2. At all relevant times, Smith was a patient within the D-wing of WRCH. D. 237 ¶ 2; D. 238-4 at 29-33 (reflecting meeting of Smith's WRCH Treatment Team on March 30, 2021 with reference to social worker Sherry Hannan ("Hannan"), nurse Sarah Maker ("Maker") and occupational therapist Diane Eames and is signed by nurse Agatha Cretzu ("Cretzu")).[2]

According to Smith's WRCH Progress Notes, Hannan received a voicemail from Smith on April 1, 2021, which she logged on April 2, in which Smith stated "that a peer made a comment that staff are not putting women on the D-Wing because 'there must be a rapist' and that this peer indicated that he is going to get staff to tell him who it is." D. 238-2 at 17. According to Hannan's notes, she met with Smith on April 2, at which time he told her "that he confronted [the] peer and showed him his paperwork that he had no sex charges and that he told the peer that he had stabbed people in jail so that the peer would leave him alone." Id. On April 5, 2021, Hannan noted that

---

[1] Previously, Smith moved for certain documents to be considered as appropriate trial exhibits, D. 235; D. 241, which the Court denied without prejudice pending resolution of the parties' summary judgment motions, D. 249. In his summary judgment motion, Smith appears to refer to these exhibits, particularly directing the Court's attention to the WRCH Progress Notes and certain findings of the WRCH Complaints Department included therein. See D. 240 at 1-2; D. 235-1 at 22-38, 40. The Court instead refers to what appears to be the more complete record of Progress Notes submitted by Daou, see D. 238-2 at 2-50, and the relevant Complaints Department findings (accompanied by a cover letter), which is appended to the amended complaint, D. 86-1 at 15-18, and submitted by Daou as an exhibit to her motion, see D. 238-4 at 36-39.

[2] The Court dismissed Smith's claims against Cretzu, D. 156, and Hannan and Maker settled Smith's claims against them, D. 162.

during a meeting that day with Smith, he "again brought up the incident of a peer talking about there being a rapist" and reported "that he got into a verbal altercation with the same peer over the TV" and that the patient "directly called him a rapist yesterday." Id. at 18-19. Cretzu's notes of the April 5, 2021, meeting, logged on April 9, also described Smith's report "that a peer on the unit was accusing him of being a rapist, stating that [the] peer walked up to him and said 'you're a rapist, my girl looked you up last night.'" Id. at 23-25.

On April 9, 2021, while in the lounge area of the B-wing, the peer patient spat on and threw an empty milk carton at Smith. D. 237 ¶¶ 3-4. In Smith's Progress Notes, a nurse's shift note from April 10, 2021, stated that Smith "reported to this writer that he want[ed] to file a [complaint] against [the] peer . . . for an[] assault that occurred yesterday." D. 238-2 at 25. On April 12, 2021, Hannan noted that Smith had left her a voicemail on April 11 reporting the assault, i.e., "indicating that a peer spit on hi[m] and hi[t] hi[m] in the back of the head and then stole his snacks on Friday," April 9. Id. at 26. Later that day, Hannan logged that she had reported the incident to the "DDPC" or "DPPC." Id. at 27.

On April 20, 2021, the WRCH Complaints Department addressed Smith's internal complaint regarding the April 9, 2021 assault. D. 238-4 at 36-39. The Complaints Department factfinder "reviewed video footage of the incident," which "revealed other staff present at the time and place of the incident, including" Maker, and "showed the peer walking toward [Smith] moving his head backward and spitting at him." Id. at 37-38. The factfinder also noted that Smith, during an interview regarding the assault, "stated that the peer ha[d] been antagonizing him since he came to the unit" and "threatened to beat him up" and that Smith "stated that he reported the issue to staff and nothing was done about it." Id. at 37. When interviewed, Maker reported "that [Smith] and the peer ha[d] been antagonizing each other for days" and that "staff ha[d] been monitoring

4

and redirecting them." Id. Maker further "stated that when [Smith] complained about being threatened by the peer, [he] was offered several times to move out of the wing, but he refused it." Id.[3] The Complaints Department concluded that Smith was assaulted in the presence of staff, that the incident was not properly documented and that "staff did contribute to an incident and/or condition that were dangerous, illegal, and/or inhumane, as defined by DMH Regulations 104 CMR 32.00." Id. at 36, 38-39. Daou was not one of the individuals interviewed in connection with the complaint, and she is not referenced in the findings. See id. at 36-39.

Daou submits that there is no evidence that she knew of any threats to Smith before the assault. D. 237 ¶ 5. As discussed infra, Smith purports to dispute this, directing the Court primarily to the Progress Notes. See, e.g., D. 240 at 3, 5; 242 at 1-3, 6-7; D. 243 at 5; D. 244 at 4-5. Although Daou's name appears at the top of each page of the Progress Notes, see D. 238-2 at 2-50, the significance of same has not been explained although it is undisputed that Dr. Daou was part of the treatment team at WRCH. As to the substance of the Progress Notes, Daou's name first appears in connection with her participation in Smith's admission process, along with Hannan and others, on March 26, 2021. Id. at 6; see id. at 4-6 (documenting Hannan's notes of Treatment Team meeting). After that, her name does not appear again until after the assault, on April 22, 2021, at which time she entered an addendum concerning a meeting with Smith on April 13, 2021 (i.e., also after the assault). Id. at 31, 33 (identifying April 13 service date in note from Dr. Erica Sorrentino ("Sorrentino")); id. at 33 (noting that Daou "met with Mr. Smith along with Dr. Sorrentino and the rest of the team"). Hannan's notes of the April 13, 2021 meeting indicated that Smith raised "the issue with his peer who he alleges assaulted him and was reminded that it [was]

_____

[3] Maker also stated during the interview that staff did not report the incident to her, and as noted above, the Complaints Department factfinder found that Maker was present at the time and place of the incident. Id. at 37-38.

being investigated," id. at 28-29, which is similar to Sorrentino's notes concerning same, see id. at 31.  On April 26, 2021, Daou logged an addendum to a note by Sorrentino regarding a meeting with Smith on April 21, 2021.  Id. at 38, 40.  Therein, Daou noted that Smith "had left several voice mails to my and [Hannan]'s mailbox" and that his requests were addressed during such meeting.  Id. at 40.  Consistent with Sorrentino's notes, see id. at 38-40, Hannan's notes of this meeting indicated that the group discussed voicemails from Smith concerning his desire not to "speak to anyone if the conversations were not recorded"; a report of "a verbal altercation with a staff member"; and requests "regarding obtaining his medical records, police reports from the alleged incident with a peer, the complaint related to that, and the 911 call."  Id. at 36-37.  Smith was discharged from this stay at WRCH on April 30, 2021.  See id. at 43-44.

Smith has not identified an expert opinion regarding any deviation by Daou from the standard of care.  D. 237 ¶ 6.

## IV.    Procedural History

Smith initiated this lawsuit on December 15, 2021.  D. 1.  He later moved to amend the complaint, which this Court allowed on February 17, 2023, after a preliminary screening of the amended complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A.  D. 83.  Specifically, the Court allowed Smith to pursue only his claim that "certain staff at [WRCH] failed to protect Smith from assault by another patient at WRCH on or about April 9, 2021," against Daou and other defendants. Id.  On March 4, 2024, upon motions, the Court dismissed certain defendants from the case, leaving four defendants, including Daou, remaining.  D. 156.  On May 8, 2024, all remaining defendants except Daou reached a settlement with Smith, D. 160, and the Court entered a settlement order of dismissal and terminated the case, D. 161.  On July 15, 2024, Smith filed a motion to reopen the case on the grounds that the settlement applied to only three defendants, D. 166, which the Court allowed "to the extent that the case is reopened as [to] the one remaining defendant, [Daou]," D.

183. On March 6, 2025, the Court denied Daou's motion for dismissal on abstention grounds. D. 194. On October 28, 2025, the Court denied Daou's motion to transfer the case to a medical malpractice tribunal. D. 221. Smith and Daou have now filed cross-motions for summary judgment. D. 236; D. 240.[4]

## V.    Discussion

As this Court explained at the motion-to-dismiss stage, analysis of Smith's failure-to-protect claim under 42 U.S.C. § 1983 implicates the Eighth and Fourteenth Amendments. D. 156 at 9-10. "[F]ailure-to-protect claims are analyzed under different standards in different institutional settings." Alves v. Murphy, 530 F. Supp. 2d 381, 387 (D. Mass. 2008). For those subject to involuntary commitment, the failure to protect a patient creates liability under the Due Process Clause of the Fourteenth Amendment in situations where a "decision by [a qualified] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg v. Romeo, 457 U.S. 307, 323 (1982). For pretrial detainees, a failure-to-protect claim arises where custodial officials demonstrate a "deliberate indifference to a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 836 (1994). This claim, too, is rooted in the Due Process Clause of the Fourteenth Amendment but generally analyzed by reference to Eighth Amendment jurisprudence. See Bell v. Wolfish, 441 U.S. 520, 545 (1979) (acknowledging that due process protections for pretrial detainees are "at least" as great as those "enjoyed by convicted prisoners"); Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002) (noting that "[p]retrial detainees are protected under the Fourteenth Amendment Due Process

---

[4] The Court ALLOWS, *nunc pro tunc*, Smith's "motion to include an exhibit," D. 247, over Daou's apparent opposition, see D. 252 at 3, and has considered same in resolving the parties' summary judgment motions.

Clause rather than the Eighth Amendment; however, the standard to be applied is the same as that used in Eighth Amendment cases").  Because Smith was involuntarily committed to WRCH and also a pretrial detainee, the Court considers his claim under both Youngberg's "professional judgment" standard and Farmer's "deliberate indifference" standard.

### A.    *Farmer* **"Deliberate Indifference" Standard**

To establish liability under the "deliberate indifference" framework set forth in Farmer, a plaintiff must demonstrate that his alleged deprivation is objectively, "sufficiently serious," see Farmer, 511 U.S. at 834, and that the institutional official was "deliberately indifferent," meaning she subjectively knew of and disregarded an excessive health or safety risk, see Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018).  As to the second, subjective component, "[t]o show such a state of mind, the plaintiff must provide evidence that the defendant had 'actual knowledge of impending harm, easily preventable,' and yet failed to take the steps that would have easily prevented that harm."  Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (internal citation omitted) (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)).

Under the Farmer framework, Daou argues that she is entitled to summary judgment because a reasonable jury could not conclude that Smith suffered a sufficiently serious injury, D. 238 at 6-8, or that Daou knew of a serious risk to Smith, id. at 4.  The Court agrees that Daou is entitled to summary judgment under Farmer for at least the reason that there is insufficient evidence in the record to permit a jury to reasonably conclude that Daou had actual knowledge of any threat that the other patient posed to Smith's safety.  See Zingg, 907 F.3d at 635-37.  Smith opposes such conclusion, arguing that Daou's name is at the top of his Progress Notes and that Daou "was responsible to monitor, review, and supervise all of her underlings," including Hannan, and that she was "obligated to read th[e] Progress Notes."  D. 242 at 1-2, 6; see D. 243 at 5; D. 240 at 3, 5; D. 244 at 4-5.  Smith, however, does not point to any evidence in the record regarding

Daou's responsibilities concerning Hannan or the Progress Notes.  Smith appears to recognize the absence of such record evidence, as he states that he "submitted record requests to W.R.C.H. requesting manuals and job description titles—to prove Dr. Daou's job included reading these Progress Notes," D. 242 at 5, and that "[a]ll [he] need[s] is the job description of Dr. Daou and the training manual of W.R.C.H. for her to follow," id. at 7.[5]  Smith also contends that he left Daou a voicemail "similar" to the one he left for Hannan before the assault, D. 242 at 2; D. 240 at 3; D. 244 at 4-5, states that he "told Dr. Daou . . . that a staff member told" the other patient about Smith's "charges of child rape," see D. 243 at 2, and that Daou "presided over Team Meetings in which [Smith] complained about" the other patient, id. at 5; D. 240 at 3, but he does not point to any evidence suggesting same.[6]  Although at the motion-to-dismiss stage, the Court accepted the truth of such allegations (and Smith's allegation that he left a voicemail for Daou regarding same, D. 242 at 2) and rejected Daou's argument concerning same, see D. 156 at 17-18, at this stage of the case, Smith cannot rest upon his allegations, see García-Catalán v. United States, 734 F.3d 100, 104 (1st Cir. 2013) (noting that "summary judgment, like a trial, hinges on the presence or absence of evidence, not on the adequacy of the pleadings").  For all of these reasons, no rational juror could conclude that Daou "had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm," Zingg, 907 F.3d at 635

---

[5] Smith has submitted a job description for a role "similar to" Daou's, see D. 247 at 1 (emphasis in original); D. 247-1, which does not shed light on Daou's responsibilities or conduct around the time of the assault.

[6] It remains that there is no evidence in the record that Dr. Daou had knowledge of the threats before the assault on Smith.  D. 237 ¶ 5; D. 238 at 4; see D. 238-2 at 22 (noting that Smith was informed during April 2, 2021 team meeting that Cretzu was "covering in the absence of his attending"); see also D. 238-4 at 35 (identifying Daou, during Smith's later, October 2021 stay, as Smith's attending psychiatrist).

(internal citation and quotation marks omitted), and thus, analyzed under the Farmer standard, Daou is entitled to summary judgment as to Smith's failure-to-protect claim.

B.    *Youngberg* **"Professional Judgment" Standard**

Additionally, the Court concludes that the absence of evidence in the record regarding Daou's alleged knowledge of any threat to Smith's welfare, combined with the absence of evidence regarding her conduct prior to the assault and any expectations or standards concerning same, also dooms his claim under the Youngberg standard. To the extent that Daou suggests the standards overlap entirely, see D. 238 at 2-3, the Court does not reach such conclusion here, see Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011) (suggesting that the Farmer and Youngberg standards "are not all that far apart" but declining to delineate differences); Youngberg, 457 U.S. at 312 n.11 (noting that instructing jury on deliberate indifference standard was erroneous). As the Court explained at the motion-to-dismiss stage, however, whether the circumstances alleged by Smith "mark a substantial departure from professional judgment necessarily depends on what [Daou] knew and what steps, if any, [she] took to address the situation." See D. 156 at 11; see, e.g., Battista, 645 F.3d at 454 (suggesting that "known risk of harm" is relevant under Youngberg but that such "is not conclusive" because focus is instead whether an official's "balancing judgments [were] within the realm of reason and made in good faith"); Aruanno v. Johnson, 683 F. App'x 172, 176 (3d Cir. 2017) (per curiam) (noting the relevance, under Youngberg, of "what the [d]efendants actually knew, when they knew it, and whether they exercised professional judgment with regard to any such knowledge"). Although the Court is mindful that the Youngberg standard "focus[es] on objective measures of . . . performance, not the state of mind of the actors," Connor B. ex rel. Vigurs v. Patrick, 774 F.3d 45, 54 n.9 (1st Cir. 2014); Doe 4 ex rel. Lopez v. Shenandoah Valley Juv. Ctr. Comm'n, 985 F.3d 327, 343 (4th Cir. 2021), liability under § 1983 still must be premised on a defendant's individual actions, see Arocho-Rodríguez v. Concepción, 177 F.4th 39,

10

44 (1st Cir. 2026) (per curiam); Tyler v. Cruz, No. 15-cv-2951-FLW-TJB, 2019 WL 1149780, at *6-7 (D.N.J. Mar. 13, 2019) (granting summary judgment to defendants on failure-to-protect claim analyzed under Youngberg where there was "no indication in the undisputed facts or evidence of any personal involvement in, or even knowledge of, the underlying circumstances by any of [the relevant] defendants, which would be required for liability under § 1983"), and on something more than simple negligence, see Connor B., 774 F.3d at 53.  Here, for the reasons already explained, a rational juror would have no basis to conclude that Daou's conduct leading up to the assault on Smith represented "a substantial departure from accepted professional judgment, practice, or standards," Youngberg, 457 U.S. at 323.  Relatedly, although the Court does not need to reach Daou's argument that expert testimony is always required to prevail on a claim under Youngberg, see D. 238 at 3, 5-6; D. 252 at 2, it agrees that there is insufficient evidence here regarding the "objective measures" relevant to Daou's conduct, see Connor B., 774 F.3d at 54 n.9, to allow a jury to evaluate whether Daou "substantial[ly] depart[ed] from accepted professional judgment, practice, or standards," Youngberg, 457 U.S. at 323.[7]  For all of these reasons, a rational juror could not conclude that Daou's alleged failure to protect Smith from the April 9, 2021 assault constituted a substantial departure from professional judgment.  Accordingly, even analyzed under the Youngberg standard, Daou is entitled to summary judgment as to Smith's failure-to-protect claim.

---

[7] Although at the motion-to-dismiss stage, the Court noted that the Complaints Department findings "provide[d] some objective criteria [concerning] 'accepted professional judgment, practice, or standards,'" D. 156 at 12 (citing D. 86-1 at 16-18), such findings are unhelpful to Smith at this stage in light of the lack of record evidence as to Daou's knowledge or conduct and any alleged, substantial departure from professional judgment.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Daou's motion for summary judgment, D. 236, and DENIES Smith's motion for summary judgment, D. 240.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge